T. A. POTTER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 12443.   Promulgated December 18, 1928.

*A. F. Schaetzle, Esq.*, for the petitioner.
*Benton Baker, Esq.*, for the respondent.

OPINION.

LANSDON: There is no dispute over the transaction upon which the respondent based his determination that the petitioner in 1919 realized profit from the sale of capital assets in the amount of $66,480. The sole controversy here relates to the basis upon which the profit from such sale, if any, should be computed. The respondent has determined that the March 1, 1913, value is the proper basis and has held that the stock in question had a value of $50 per share at that date. The petitioner separates the 1,662 shares of stock sold in 1919 into lots, one of which he avers was acquired in 1905 at a cost in excess of the sales price and the other much later, but prior to March 1, 1913, at a cost which he does not attempt to show, and undertakes to prove that the 1,224 shares first acquired cost him more than the sales price and that the 442 shares had a value at March 1, 1913, in excess thereof.

The transaction in which the petitioner acquired 1,224 shares of stock in 1905 was complicated, but by cutting through all the forms and verbiage of the sales contract and the issue and reissue of stock it is easily understood. The three old companies in which the petitioner owned an undisclosed stock interest were in financial difficulties just prior to April 21, 1905. They had outstanding bonds in the amount of $150,000; they owed large amounts on current and unfunded obligations; and they were without free capital for use in operations. They tried, without success, to float additional bonds. In this situation a deal was made with the Bell Company, which caused the new company to be organized to acquire and operate the properties of the vendors. The deal was carried out and the new company issued its stock and paid cash as provided in the sales contract and thereby acquired all the tangible and intangible assets of the old companies. Thereafter the vendors distributed 4,900 shares of such stock to their several shareholders and transferred 5,100

shares to a trustee for the benefit of the Bell Company for $42,000 in cash. When all the details of the transaction were complete, the petitioner had disposed of all his stock interest in the old companies and in payment or liquidation thereof had received 1,224 shares of stock of the new company. The petitioner contends that the cost of the stock so acquired must be measured by his interest in the fair market value of the assets of the old companies as and when transferred, and that such interest was greatly in excess of the par value of the stock received. If his theory is sound and he proves that the assets of the vendor companies at April 21, 1905, had the value which he alleges, he must prevail here, since it is now well established that gain from the sale of capital assets, acquired prior to March 1, 1913, must be based on cost if such cost is greater than the fair market value or price at March 1, 1913. He argues that inasmuch as he received 1,224 of the 4,900 shares distributed by the old companies to their stockholders, his interest in the old companies was $\frac{1224}{4900}$ of the value of their assets at the date of their transfer to the new company, and that the cost of the shares which he received in liquidation of his interests in the old companies was that fraction of the total net value of the assets of the vendor companies at April 21, 1905.

Since the petitioner owned none of the assets of any of the old companies by reason of his stockholdings therein, it is clear that the cost of the stock to him can not be ascertained by a mere evaluation of a fraction of such property. What the petitioner owned was stock in the old companies, and whatever he received in the circumstance here must have been in liquidation of such stock. The real problem here is to determine the value of the stock of the new company which was distributed to the petitioner in exchange for his stock interests in the old companies.

It is in evidence that the Bell Company paid $42,000 to the old companies and received 5,100 shares of the stock of the new company. This would seem to establish the value of the stock at a little below $8 per share, but it is not at all clear that the acquisition of stock by the Bell Company was a transaction at arm's length or of such a nature as to establish the actual or the cash value of the shares. We must, therefore, if possible, determine the value of the stock by ascertaining the value of the assets back of it. *Wallis Tractor Co.*, 3 B. T. A. 981; *W. S. Forbes*, 7 B. T. A. 611.

In support of his theory of the cost of the stock to him the petitioner adduced much evidence for the purpose of proving the value of the assets transferred to the new company. Charles Webster, Chairman of the Board of Railway Commissioners, was the principal witness examined on this point. He has been a member of such

board for 11 years. He was at one time vice president of the Western Electric Telephone Co., one of the vendors. He has built several telephone properties in Minnesota. He has financed telephone, electric light, and gas companies at Prescott and Bisbee, in Arizona, and at Kansas City, and for a long time, and especially during the year preceding the hearing, has been more or less in touch with the telephone business. He testified that in his opinion toll lines similar to those sold to the new company were worth not less than $222 per mile in 1905, and that at that date a local telephone exchange in a small city had a value of from $125 to $150 per installed telephone. He also testified that he was familiar with the toll lines in Dakota which the petitioner sold for $222 per mile and that the similar lines transferred by the vendors to the new company were more valuable than such Dakota property.

The petitioner, testifying in his own behalf, agreed with Webster on the valuation of toll lines and telephone exchanges in 1905. He also testified that the intangible property transferred to the new company had a very substantial value in 1905, but gave no figures except as to the perpetual franchise which one of the vendor companies had for the operation of an exchange at Mason City, which he regarded as worth at least $75,000.

If there were no collateral conflicting or contradictory facts affecting the weight of the evidence above summarized, we might reach the conclusion that the assets transferred by the old companies were worth approximately $1,000,000. It is certain, however, that against such assets in the hands of the vendors there were obligations in amounts not disclosed by the record. We do not know when the toll lines and exchanges were built, or at what cost, or to what extent depreciation had been sustained prior to the transfer. Except the petitioner's unsupported opinion of the value of the perpetual franchise for the operation of a telephone exchange at Mason City, we have no evidence of the cost or value of the intangibles which were taken into the accounts of the new company at a figure in excess of $500,000. Nor is there any evidence of an immediate appreciation of the value of the property resulting from its acquisition by the new company. With so many unknown or uncertain factors affecting the value of the property in question, we are unable, on the record here, to find the value at the date of issue of the shares of stock of the new company which the petitioner received in liquidation of his stock interests in the old companies.

The only evidence offered by the petitioner in support of his contention that the 442 shares acquired in 1910 or 1911 had a fair market value or price at March 1, 1913, greater than the sales price received in 1919 is a trial balance of the new company as of February 28,

1913, which shows a book value of $98.246 per share. If such evidence were proof of value, there would be no tax controversy here since the book value at March 1, 1913, is greater than the sales price received in the taxable year. The record discloses that from its organization in 1905 until after March 1, 1913, the new company earned no operating profits and that included in the assets account at the basic date was a great mass of intangibles concerning which we have no information either as to cost or value.

There is no evidence as to either lot of stock sufficient to overcome the presumption that the Commissioner's determination of value at March 1, 1913, is the proper basis for computing the gain resulting from the sale thereof in 1919.

*Decision will be entered for the respondent.*